**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

JESSE DONOLD ROBINSON,     )
                                              )
               Plaintiff,     )
                                              )     Civil Action No. 11-765
                    v.           )
                                              )     Judge Nora Barry Fischer
COMMISSIONER OF     )
SOCIAL SECURITY,     )
                                              )
               Defendant.     )

## <u>MEMORANDUM OPINION</u>

### I.    INTRODUCTION

Jesse Donold Robinson ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying his application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401 – 433, 1381 – 1383f ("Act"). This matter comes before the court on cross motions for summary judgment. (ECF Nos. 10, 12). The record has been developed at the administrative level. For the following reasons, Plaintiff's Motion for Summary Judgment is DENIED, and Defendant's Motion for Summary Judgment is GRANTED.

## II.   PROCEDURAL HISTORY

Plaintiff applied for DIB on May 7, 2008 and SSI on January 29, 2009, claiming that he was disabled from all work as of April 15, 2008 due to both physical and mental impairments. (R. at 102 – 16).[1] Plaintiff was initially denied benefits on December 18, 2008. (R. at 70 – 74). A hearing was scheduled for May 19, 2010, and Plaintiff appeared to testify represented by counsel. (R. at 33 – 56). A vocational expert also testified. (R. at 33 – 56). The Administrative Law Judge ("ALJ") issued his decision denying benefits to Plaintiff on July 1, 2010. (R. at 8 – 32). Plaintiff filed a request for review of the ALJ's decision by the Appeals Council, which request was denied on May 11, 2011, thereby making the decision of the ALJ the final decision of the Commissioner. (R. at 1 – 5).

Plaintiff filed his Complaint in this court on June 10, 2011. (ECF No. 3). Defendant filed his Answer on September 23, 2011. (ECF No. 5). Cross motions for summary judgment followed. (ECF Nos. 10, 12).

## III.   STATEMENT OF FACTS

### A.   General Background

Plaintiff was born November 29, 1966 and was forty three[2] years of age at the time of his administrative hearing. (R. at 38). Plaintiff was separated from his wife, and lived with his sister in her home. (R. at 38). Plaintiff had eight children. (R. at 215). Plaintiff only completed formal schooling through the eleventh grade, but ultimately earned his GED. (R. at 38 – 39). He had no post-secondary education or vocational training. (R. at 38 – 39). He last worked in April 2008 as a laborer with a construction company. (R. at 39).

---

[1]     Citations to ECF Nos. 6 – 6-9, the Record, *hereinafter*, "R. at __."

[2]     Plaintiff is defined as a, "Younger Person."  20 C.F.R. §§ 404.1563, 416.963.

In his own self-report, Plaintiff claimed that he was unable to work because of asthma, depression, alcoholism, and back problems[3]. (R. at 118). He had no difficulties with personal care. (R. at 129). When needed, he could "cook most things well." (R. at 130). He helped with housework and yardwork when he was still living with his wife. (R. at 130). He would drive his car, or ride with others. (R. at 131). He went grocery shopping, and he paid his bills and handled checking and savings accounts. (R. at 131). Plaintiff went fishing or played games with his family for recreation. (R. at 132).

Most of Plaintiff's day was spent lying around the house. (R. at 128). He noted that he would go outside eight to ten times per day, but that he tired quickly. (R. at 131 – 32). He was depressed, and could sometimes be forgetful. (R. at 133). He claimed that he had been laid off from work in the past because of difficulty getting along with other people, that he did not handle stress well, that he did not handle changes in routine well, and that he often had unusual behaviors and fears. (R. at 134).

B. Medical History

Plaintiff was admitted to UPMC Braddock Hospital, in Braddock, Pennsylvania, on March 30, 2008. (R. at 181 – 97). Plaintiff sought detoxification for alcohol addiction. (R. at 181 – 97). Plaintiff reported drinking a fifth of liquor every day. (R. at 181 – 97). He claimed that his longest period of abstinence was twelve months. (R. at 181 – 97). When he appeared at the hospital, he was in no acute distress. (R. at 181 – 97). A global assessment of functioning[4]

---

[3]     In his Motion for Summary Judgment, Plaintiff raises no objections to the ALJ's conclusions regarding the impact of his physical impairments on his ability to work. (ECF Nos. 11, 14, 17). As a result, discussion will be limited to the facts on record which pertain to Plaintiff's mental impairments.

[4]     The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 91 – 100 exhibits "[s]uperior functioning in a wide range of

("GAF") score of 37 was given at admission. (R. at 181 – 97). He was discharged on April 4, 2008 after completing the detoxification protocol and making adequate progress. (R. at 181 – 97).

The record shows that Plaintiff first sought psychiatric care at Mercy Behavioral Health ("Mercy") in Pittsburgh, Pennsylvania, on April 7, 2008. (R. at 424 – 26). Plaintiff had just been released from a detoxification program at a local hospital. (R. at 424 – 26). Plaintiff claimed that he was a paranoid schizophrenic, and that as a result, he drank alcohol excessively – up to a fifth of liquor daily. (R. at 424 – 26). It was noted that Plaintiff had previously been placed on psychiatric medications. (R. at 424 – 26). He reported feeling depressed, anxious, and angry. (R. at 424 – 26).

Plaintiff began group therapy in Mercy's intensive outpatient day program on April 14, 2008. (R. at 458). Plaintiff reported sobriety since March 30, 2008. (R. at 458). He had not yet attended Alcoholics Anonymous ("AA") or Narcotics Anonymous ("NA") meetings at that point. (R. at 458). He received a GAF score of 45. (R. at 458).

Plaintiff was evaluated more thoroughly on April 18, 2008 for purposes of a provisional diagnosis and to formulate a treatment plan. (R. at 398 – 423, 466 – 72). Plaintiff's primary

---

activities" and "no symptoms;" of 81 – 90 exhibits few, if any, symptoms and "good functioning in all areas," is "interested and involved in a wide range of activities," is "socially effective," is "generally satisfied with life," and experiences no more than "everyday problems or concerns;" of 71 – 80, may exhibit "transient and expectable reactions to psychosocial stressors" and "no more than slight impairment in social, occupational, or school functioning;" of 61 – 70 may have "[s]ome mild symptoms" or "some difficulty in social, occupational, or school functioning, but generally functioning pretty well" and "has some meaningful interpersonal relationships;" of 51 – 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" of 41 – 50 may have "[s]erious symptoms (e.g., suicidal ideation …)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" of 31 – 40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood;" of 21 – 30 may be "considerably influenced by delusions or hallucinations" or "serious impairment in communication or judgment (e.g., … suicidal preoccupation)" or "inability to function in almost all areas;" of 11 – 20 may have "[s]ome danger of hurting self or others" or "occasionally fails to maintain minimal personal hygiene" or "gross impairment in communication;" of 1 – 10 may have "[p]ersistent danger of severely hurting self or others" or "persistent inability to maintain minimal personal hygiene" or "serious suicidal act with clear expectation of death." *Id.*

diagnoses were alcohol dependence and paranoid schizophrenia. (R. at 398 – 423, 466 – 72). Initially, Plaintiff's goals were to maintain sobriety, learn healthy coping skills, gain control of mental health issues, and attend therapy several times per week. (R. at 398 – 423, 466 – 72). Plaintiff claimed that his longest period of sobriety was one year. (R. at 398 – 423, 466 – 72). Domestic issues with his wife, job loss, ulcers, a diagnosis of fatty liver, and loss of interest in daily activities were attributed to Plaintiff's alcohol intake. (R. at 398 – 423, 466 – 72). Generally, Plaintiff's appearance, speech, behavior, affect, thought processes, perceptions, insight and judgment, and cognition and intellectual functioning were normal. (R. at 398 – 423, 466 – 72). Plaintiff's mood, however, was sad, and his thought content was paranoid and persecutory. (R. at 398 – 423, 466 – 72). Plaintiff had an established history of alcohol abuse and detoxification attempts. (R. at 398 – 423, 466 – 72). His GAF score was 38. (R. at 398 – 423, 466 – 72). Plaintiff was to engage in therapeutic programs as well as medication management. (R. at 213, 398 – 423, 466 – 72).

Plaintiff continued in the rehabilitation program at Mercy through June 2008. (R. at 432 – 50, 452 – 57, 462 – 65). Plaintiff generally received GAF scores of 45. (R. at 432 – 50, 452 – 57, 462 – 65). He had sporadic attendance at AA and NA meetings. (R. at 432 – 50, 452 – 57, 462 – 65). Plaintiff struggled with anxiety, but managed to maintain his sobriety. (R. at 432 – 50, 452 – 57, 462 – 65). His paranoia was noted as minimal to mild, and his depression and anxiety were mild. (R. at 432 – 50, 452 – 57, 462 – 65). Plaintiff requested clearance from Mercy to return to work in May 2008. (R. at 432 – 50, 452 – 57, 462 – 65). He then began to miss his regular therapy sessions. (R. at 432 – 50, 452 – 57, 462 – 65). By June 2, 2008, Plaintiff's case was closed and he was discharged from the rehabilitation program at Mercy due to an ongoing failure to attend treatment. (R. at 432 – 50, 452 – 57, 462 – 65). Plaintiff's GAF

at discharge was 45, and he had made only minimal progress. (R. at 432 – 50, 452 – 57, 462 – 65).

On June 12, 2008, Plaintiff was admitted to the Western Pennsylvania Hospital in Pittsburgh, Pennsylvania. (R. at 198 – 207). Plaintiff complained of experiencing nausea and vomiting for seven days prior to his admission. (R. at 198 – 207). Hospital staff noted a history of alcoholism and withdrawal related seizure. (R. at 198 – 207). Plaintiff reported binge drinking during the previous month. (R. at 198 – 207). He claimed that he drank up to a fifth of whiskey every day, in addition to an unknown quantity of beer. (R. at 198 – 207). Plaintiff was observed to be in no acute distress, but was anxious, depressed, and paranoid. (R. at 198 – 207). Plaintiff had not been taking his psychiatric medications. (R. at 198 – 207). He was placed in detoxification. (R. at 198 – 207). Plaintiff stabilized, and upon completion of the detoxification program, was released June 13, 2008 to attend outpatient rehabilitation. (R. at 198 – 207). Plaintiff was diagnosed with cirrhosis, fatty liver, gastritis, anemia, and alcohol abuse. (R. at 198 – 207). He was advised to refrain from drinking again. (R. at 198 – 207).

Plaintiff was admitted to Jefferson Regional Medical Center in Pittsburgh, Pennsylvania on October 10, 2008. (R. at 249 – 83). Plaintiff presented with complaints of chest pain, nausea, and vomiting. (R. at 249 – 83). Plaintiff was considered to be experiencing slight withdrawal. (R. at 249 – 83). Plaintiff described imbibing up to a fifth of alcohol per day. (R. at 249 – 83). He stated that his last drink was the day prior to his hospital admission. (R. at 249 – 83). Plaintiff reported to the physician that he had been through a detoxification program three times, and that his longest period of abstinence was two years. (R. at 249 – 83). Plaintiff was observed to be alert and oriented, with a stated history of acute and chronic alcoholism, depression, and schizophrenia. (R. at 249 – 83). Plaintiff had not been taking his psychiatric medications. (R. at

249 – 83). He blamed his non-compliance on insurance-related issues. (R. at 249 – 83). Plaintiff was discharged on October 14, 2008 following improvement in his condition. (R. at 249 – 83). At that time he was diagnosed with alcohol withdrawal, atypical chest pain, nausea and vomiting, hypertension, fatty liver, asthma, lumbar disc disease, history of ulcers, depression, and alcohol abuse. (R. at 249 – 83). He was advised to avoid drinking. (R. at 249 – 83).

Plaintiff reinitiated treatment at Mercy on February 13, 2009. (R. at 366 – 88, 460 – 61). Plaintiff was evaluated for purposes of diagnosis and formulating a treatment plan. (R. at 366 – 88, 460 – 61). Plaintiff's primary problem to be addressed was his anxiety. (R. at 366 – 88, 460 – 61). Plaintiff claimed that he frequently experienced panic attacks. (R. at 366 – 88, 460 – 61). He also claimed that his longest previous period of sobriety was two years. (R. at 366 – 88, 460 – 61). Mercy staff noted Plaintiff's appearance, speech, behavior, affect, thought processes, perceptions, insight and judgment, and cognition and intellectual functioning to be within normal limits. (R. at 366 – 88, 460 – 61). Plaintiff's mood, however, was sad, and his thought content was paranoid and persecutory. (R. at 366 – 88, 460 – 61). Plaintiff denied past visits to AA and NA. (R. at 366 – 88, 460 – 61). He reported multiple detoxifications. (R. at 366 – 88, 460 – 61). Plaintiff was diagnosed with depressive disorder and anxiety. (R. at 366 – 88, 460 – 61). His GAF score was 45. (R. at 366 – 88, 460 – 61). He was recommended for individual therapy and medication management. (R. at 366 – 88, 460 – 61).

Plaintiff was discharged from the rehabilitation program at Mercy on April 16, 2009. (R. at 427 – 30). Plaintiff failed to attend any treatment programs. (R. at 427 – 30). He also failed to respond to outreach by Mercy staff. (R. at 427 – 30).

Plaintiff sought treatment at Mon Yough Community Services ("Mon Yough") for treatment of his paranoia and anxiety on May 14, 2009. (R. at 485 – 86). He was seen by psychiatrist Dennis Wayne, M.D. (R. at 485 – 86). Plaintiff reported paranoia and depression, worsened by the consumption of alcohol. (R. at 485 – 86). Plaintiff claimed that he drank up to two liters of wine per day, and occasionally half of a case of beer. (R. at 485 – 86). Plaintiff described the nature of his alcohol use as long-standing and progressively worsening. (R. at 485 – 86). Plaintiff was diagnosed with fatty liver, and was just short of a diagnosis of cirrhosis. (R. at 485 – 86). Upon examination, Dr. Wayne noted Plaintiff to be alert and oriented, neatly dressed, irritable, fatigued, and of above-average intelligence. (R. at 485 – 86). He noted that Plaintiff complained of sleep disturbance, nervousness, and extreme paranoia. (R. at 485 – 86). Plaintiff was diagnosed with recurrent major depression and alcoholism. (R. at 485 – 86). Plaintiff was started on new prescription medications and was to return to Dr. Wayne in six to eight weeks. (R. at 485 – 86).

Dr. Wayne completed a progress report for Plaintiff on July 2, 2009. (R. at 483 – 84). Dr. Wayne opined that Plaintiff had been drinking heavily to self-medicate his depression and anxiety related to conflict with his ex-wife. (R. at 483 – 84). Plaintiff still reported difficulties with sleeping, but was taking his prescribed medications. (R. at 483 – 84). Plaintiff's mood and affect were noted to be anxious and depressed, his impulse control was fragile, his insight and judgment were impaired, and he was preoccupied with environmental stressors. (R. at 483 – 84). Plaintiff was otherwise normal in appearance, orientation, speech, and thought processes. (R. at 483 – 84). His GAF score was noted to be 46. (R. at 483 – 84). Plaintiff was continued on his medications and referred for a rehabilitation program to control his drinking. (R. at 483 – 84).

In a subsequent evaluation on July 29, 2009, Dr. Wayne indicated that Plaintiff had recently been discharged from detoxification. (R. at 481 – 82). Plaintiff complained primarily of anxiety, but claimed that his depression and mood were under control with medication. (R. at 481 – 82). Plaintiff reported seeing a therapist regularly. (R. at 481 – 82). Dr. Wayne found Plaintiff's affect and mood to be anxious, and his impulse control was mostly controlled. (R. at 481 – 82). Plaintiff was otherwise noted to have normal appearance, orientation, speech, judgment and insight, thought process, and thought content. (R. at 481 – 82). His GAF score was 46. (R. at 481 – 82).

Plaintiff's primary care physician was Bryce Palchick, M.D. Plaintiff was first seen by Dr. Palchick on August 25, 2009. (R. at 304 – 11). At that time, Plaintiff's psychological problems were indicated to be paranoia, anxiety, and depression. (R. at 304 – 11). Dr. Palchick's notes indicated that Plaintiff was seeing a therapist and psychiatrist on a weekly basis, and that he was taking prescription medication for his anxiety and depression. (R. at 304 – 11). The doctor noted that Plaintiff was not using alcohol at the time. (R. at 304 – 11). Plaintiff complained of depression and anxiety, but denied suffering memory loss, mental disturbance, suicidal ideation, hallucinations, or paranoia. (R. at 304 – 11). Plaintiff was alert and oriented, his affect and mood were appropriate, he made good eye contact, and interacted with Dr. Palchick normally. (R. at 304 – 11).

Dr. Wayne assessed Plaintiff's progress on September 1, 2009. (R. at 479 – 80). He noted that Plaintiff complained of increased paranoia and depression. (R. at 479 – 80). However, this increase occurred after Plaintiff ceased taking his prescribed medications due to sexual side-effects. (R. at 479 – 80). In spite of this, Dr. Wayne still noted Plaintiff to be normal in appearance, orientation, impulse control, speech, judgment and insight, and thought content.

(R. at 479 – 80).  Plaintiff's diagnoses were recurrent, moderate major depression and alcohol abuse.  (R. at 479 – 80).  Plaintiff's GAF score was 46.  (R. at 479 – 80).

Following Plaintiff's return to compliance with his prescribed medications, Dr. Wayne noted on September 21, 2009 that Plaintiff was sleeping very well and denied depression.  (R. at 477 – 78).  Plaintiff claimed that he had also been sober for approximately three months.  (R. at 477 – 78).  Plaintiff did still complain of paranoia.  (R. at 477 – 78).  While Plaintiff's mood was euthymic and his affect somewhat blunted, he was normal with respect to his appearance, orientation, impulse control, speech, judgment and insight, thought processes, and thought content.  (R. at 477 – 78).  His GAF score remained at 46.  (R. at 477 – 78).

On January 12, 2010, despite complaining of poor sleep, increased depression, increased nervousness, and occasional paranoia, Dr. Wayne indicated that Plaintiff was normal in appearance, orientation, impulse control, speech, judgment and insight, thought processes, and thought content.  (R. at 475 – 76).  Plaintiff's mood was somewhat dysphoric and his affect was flat.  (R. at 479 – 80).  Plaintiff's GAF score continued to be 46, and Plaintiff's diagnoses were recurrent, moderate major depression and alcohol abuse.  (R. at 475 – 76).

Plaintiff was seen by his primary care physician again on February 4, 2010.  (R. at 314 – 18).  Dr. Palchick noted that Plaintiff had no complaints or concerns, and that he was feeling well.  (R. at 314 – 18).  Plaintiff's mental issues were still noted to be paranoia, anxiety, and depression.  (R. at 314 – 18).  However, at the time of the visit, Plaintiff denied depression, anxiety, memory loss, mental disturbance, suicidal ideation, hallucinations, or paranoia.  (R. at 314 – 18).  Plaintiff was alert and oriented, had appropriate mood and affect, made good eye contact, and interacted with Dr. Palchick normally.  (R. at 314 – 18).  Specifically, Plaintiff's

paranoia was found to be stable and under fair control. (R. at 314 – 18). Plaintiff was advised to continue seeing his therapist and psychiatrist bi-weekly. (R. at 314 – 18).

In his final note of record on April 7, 2010, Dr. Wayne indicated that Plaintiff reported that he was at baseline, and had no symptoms or complaints. (R. at 473 – 74). Plaintiff had been fully compliant with his treatment and medication. (R. at 473 – 74). Plaintiff's appearance, orientation, affect and mood, impulse control, speech, judgment and insight, thought processes, and thought content were all normal. (R. at 473 – 74). Plaintiff's diagnoses remained recurrent, moderate major depression and alcohol abuse. (R. at 473 – 74). His GAF score was changed to 50. (R. at 473 – 74).

C. Functional Capacity

Plaintiff underwent a Clinical Psychological Disability Evaluation by David Newman, Ph.D. on September 17, 2008. (R. at 214 – 19). Dr. Newman's initial impression was that Plaintiff was neatly groomed, displayed good hygiene, had an easy conversational manner, was not anxious, was alert and responsive, articulated well, demonstrated relevant, rational, coherent thought, and was entirely cooperative. (R. at 214 – 19). Plaintiff's complaints included difficulty with depression, schizophrenia, concentration, and paranoia. (R. at 214 – 19). At the time, Plaintiff was not taking any medicine or engaging in therapy. (R. at 214 – 19). For most of any given day, Plaintiff would, "sit around, play cards." (R. at 214 – 19). Plaintiff did not generally cook. (R. at 214 – 19).

During Dr. Newman's examination, Plaintiff was appropriate, showed a reasonable range and depth of affect, and was only mildly to moderately depressed. (R. at 214 – 19). His abstract thinking was intact, his thoughts were not disturbed, he had no difficulties identifying similarities and differences, he had no difficulty with interpretation of simple sayings, and his concept

formation was intact.  (R. at 214 – 19).  Plaintiff's general fund of knowledge was not great.  (R. at 214 – 19).  He was, however, capable of naming presidents back to Ronald Reagan, was able to do simple math, and showed only mild disturbance in his ability to concentrate.  (R. at 214 – 19).  Plaintiff was oriented in all spheres, his memory was reasonably intact, he did not exhibit significant difficulty with impulse control, and his social judgment was sufficient.  (R. at 214 – 19).  Dr. Newman indicated that Plaintiff's insight was good.  (R. at 214 – 19).

Based upon a review of the available medical record and his personal examination of Plaintiff, Dr. Newman concluded that Plaintiff's primary problem was alcoholism.  (R. at 214 – 19).  Dr. Newman recommended intensive substance abuse rehab and abstinence.  (R. at 214 – 19).  He did not feel that Plaintiff could manage funds in his best interests, because it would likely be spent supporting Plaintiff's alcohol habit.  (R. at 214 – 19).

In terms of specific functional limitations, Dr. Newman indicated that Plaintiff was slightly to moderately limited in understanding, remembering, and carrying out short, simple instructions, moderately limited in understanding, remembering, and carrying out detailed instructions, and slightly limited in making simple work-related judgments.  (R. at 214 – 19).  Plaintiff's limitations were attributed directly to his alcoholism.  (R. at 214 – 19).  Plaintiff was moderately limited in interaction with the public, moderately to markedly limited in interaction with supervisors and co-workers, moderately to markedly limited responding to work pressures in a normal work setting, and moderately limited responding to changes in a routine work setting.  (R. at 214 – 19).  Once again, these limitations were attributed primarily to Plaintiff's alcoholism.  (R. at 214 – 19).

Dr. Newman opined that when abusing alcohol, Plaintiff's mood, judgment, and concentration would be variable.  (R. at 214 – 19).  When he was not abusing alcohol, he would

still likely to be irritable and depressed. (R. at 214 – 19). If Plaintiff abstained from alcohol, Dr. Newman felt that Plaintiff would have no areas of significant dysfunction. (R. at 214 – 19).

A mental residual functional capacity ("RFC") assessment and psychiatric review technique was completed by state agency evaluator Arlene Rattan, Ph.D. on September 23, 2008. (R. at 220 – 37). In her evaluations, Dr. Rattan diagnosed Plaintiff with substance addiction disorders. (R. at 220 – 37). Plaintiff was found to be only moderately to not significantly limited in all areas of functioning. (R. at 220 – 37). In terms of activities of daily living, Plaintiff had only mild restriction. (R. at 220 – 37). In maintaining social function, concentration, persistence, and pace, Plaintiff exhibited moderate restriction. (R. at 220 – 37). Plaintiff had no repeated episodes of decompensation of extended duration. (R. at 220 – 37).

After review of the medical records and findings of Dr. Newman, Dr. Rattan opined that Plaintiff was capable of maintaining full-time employment. (R. at 220 – 37). Dr. Rattan did not accord significant weight to the limitations findings of Dr. Newman, because she felt that they were unduly severe when compared with the record and Dr. Newman's own observations. (R. at 220 – 37).

Nosratollah Danai, M.D. performed a physical evaluation of Plaintiff on behalf of the Bureau of Disability Determination on September 26, 2008. (R. at 239 – 48). In her assessment, with respect to Plaintiff's mental functioning and DAA history, Dr. Danai indicated that Plaintiff's depression was a longstanding issue, and that Plaintiff had failed to remain in compliance with his medication regimen or to attend a mental health clinic. (R. at 220 – 37). Plaintiff admitted to frequently drinking beer. (R. at 220 – 37). Dr. Danai observed Plaintiff to be both tired and depressed, although he was also alert. (R. at 220 – 37). In addition to

diagnosing physical conditions, Dr. Danai diagnosed Plaintiff with depression and alcohol abuse by history.  (R. at 220 – 37).

At a follow-up evaluation with Dr. Danai on November 20, 2008, Plaintiff presented with the same problems, although he was noted to be attending Mercy regularly.  (R. at 284 – 87).  He was still observed to be tired and depressed, but he was also alert.  (R. at 284 – 87).  In addition to physical diagnoses, Plaintiff was diagnosed with depression and alcohol abuse per history.  (R. at 284 – 87).

On December 1, 2008, Casey Moffa, D.O. completed a form on which Plaintiff was indicated to be completely, temporarily disabled beginning December 1, 2008 and ending December 1, 2009.  (R. at 291).  No objective findings accompanied the statements on the form.  (R. at 291).  The primary diagnoses were hypertension and chronic lumbar back pain.  (R. at 291).  Plaintiff was secondarily diagnosed with alcohol abuse, liver cirrhosis, and depression.  (R. at 291).

In a physical RFC assessment completed by state agency evaluator Nghia Van Tran, M.D. on December 17, 2008, Plaintiff was diagnosed with asthma, back problems, and alcoholism.  (R. at 297 – 303).  Diagnostic testing on Plaintiff's liver revealed normal functioning.  (R. at 297 – 303).  A history of hospital admissions stemming from alcohol abuse was noted.  (R. at 297 – 303).

D.  Administrative Hearing

Plaintiff testified that at his last job in 2008, he worked for a construction company and operated a crane.  (R. at 39).  He also tied reinforcing wire.  (R. at 39).  Plaintiff stated that he was laid off and received unemployment compensation for approximately one year.  (R. at 40).  Following the expiration of those benefits, Plaintiff applied for and received public assistance

through the state; he had not found other employment. (R. at 38, 40). He eventually moved into a home with his sister several months prior to his hearing. (R. at 38).

Plaintiff explained that he visited a psychiatrist and a therapist on a regular basis for anxiety, depression, and paranoia. (R. at 41 – 43, 52). He stated that he was prescribed medication for his mental conditions and to help him sleep. (R. at 41, 48, 52). He did not feel that the medication or therapy had helped with his mental condition. (R. at 43, 53). He complained of difficulty with concentration and distraction. (R. at 52). He avoided going outside or being near other people for fear of something bad happening. (R. at 53).

Plaintiff admitted to having abused alcohol in the past, but claimed that he had been largely alcohol-free for several months. (R. at 42 – 43). He stated that he only occasionally drank. (R. at 43). He no longer attended AA meetings. (R. at 43). Plaintiff indicated that he was very cautious about drinking because he was diagnosed with a fatty liver. (R. at 48).

Plaintiff testified that he spent most of his time with his girlfriend. (R. at 43). He also slept for significant periods during the day because he allegedly had difficulty sleeping at night. (R. at 50). Plaintiff was capable of driving and maintained a license, but his girlfriend did most of the driving. (R. at 46 – 47). He would accompany her to the grocery store. (R. at 46). Plaintiff did not help with chores at his sister's home, however. (R. at 49).

At the conclusion of Plaintiff's testimony, the ALJ asked the vocational expert whether a significant number of jobs existed in the national economy for a hypothetical individual of Plaintiff's age, educational background, and work experience, if he or she were limited to light exertional work requiring no more than occasional postural activities, only simple instruction, no close coordination with or proximity to others, no crowds or intense supervision, and no changes in the work setting. (R. at 54). The vocational expert replied that Plaintiff would be capable of

working as a "sorter," with 400,000 positions available in the national economy, or as a "small parts assembler," with 250,000 positions available.  (R. at 54).

The ALJ then inquired as to whether those jobs would be available if the hypothetical individual could only do sedentary work, with the same limitations.  (R. at 54).  The vocational expert replied that such a person could instead work as a "surveillance system monitor," with 50,000 positions available, as an "assembler," with 200,000 positions available, or as a "document preparer," with 100,000 positions available.  (R. at 54 – 55).  The ALJ further limited the hypothetical individual to work not involving an assembly line pace.  (R. at 55).  The vocational expert responded that the same jobs would be available.  (R. at 55).

## IV.  STANDARD OF REVIEW

To be eligible for social security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months.  42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F.2d 581, 583 (3d Cir. 1986).  When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his

past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §404.1520(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)[5], 1383(c)(3)[6]; *Schaudeck v. Comm'r Soc. Sec.*, 181 F. 3d 429, 431 (3d Cir. 1999). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. §706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Burns v. Barnhart,* 312 F.3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v.*

---

[5]    Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[6]    Section 1383(c)(3) provides in pertinent part:
> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

*Shalala*, 55 F.3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 – 97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196 – 97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3d. Cir. 1986).

## V. DISCUSSION

In his decision, the ALJ concluded that Plaintiff suffered medically determinable severe impairments in the way of alcoholism, asthma, low back pain secondary to disc bulge and degenerative disc disease, right shoulder deformity, schizophrenia, paranoia, depression, and anxiety. (R. at 14). The ALJ found Plaintiff to be completely disabled as a result of limitations stemming from all of the above impairments. (R. at 20). However, the ALJ simultaneously determined that if Plaintiff abstained from abusing alcohol, the remaining limitations would not preclude eligibility for a significant number of jobs in the national economy. (R. at 23). As a result, and relying upon the testimony of the vocational expert, the ALJ denied Plaintiff benefits because DAA was material to the finding of disability. (R. at 28).

Plaintiff objects to the determination of the ALJ, arguing that he erred by applying the incorrect legal standard when concluding that Plaintiff's drug and alcohol abuse ("DAA") was a factor material to a finding of complete disability, and that even if the correct standard were to be applied, the facts as established by the objective medical record allegedly warranted a finding that DAA was not material to Plaintiff's disability and that he was entitled to full benefits. (ECF No. 11).

First, Plaintiff argues in three separate briefs that the ALJ's decision should at least be remanded because the ALJ apparently relied, in part, on the Ninth Circuit case, *Parra v. Astrue*, 481 F. 3d 742 (9th Cir. 2007), to deny Plaintiff disability benefits. (ECF Nos. 11, 14, 17). The central thrust of Plaintiff's argument is that *Parra* incorrectly places the burden on the claimant to show that he or she would be disabled from all work irrespective of DAA. As such, the ALJ's reliance on the decision allegedly calls into question the propriety of the disability determination.

As with all social security cases, a claimant must prove to the Commissioner that he or she is incapable of engaging in substantial gainful activity. 42 U.S.C. §423(d)(1)(A); *Brewster,* 786 F.2d at 583. When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met this requirement. 20 C.F.R. §§ 404.1520, 416.920. Assuming a claimant meets his or her burden at Steps 1 through 4, Step 5 places a burden upon the Commissioner to prove that a particular claimant is able to perform substantial gainful activity in jobs available in the national economy. *Doak*, 790 F.2d at 28.

In cases involving DAA, however, the Step 5 analysis takes on an additional component. The Act states that "an individual shall not be considered to be disabled . . . if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled." *Ambrosini v. Astrue*, 727 F.Supp.2d 414, 428 (W.D. Pa. 2010)

(quoting 42 U.S.C. §§ 423(d)(2)(c), 1382c(a)(3)(J)).  According to 20 C.F.R. §§ 404.1535 and 416.935, the 'key factor' in making the above conclusion is determining whether a claimant would continue to be disabled if he or she ceased to use drugs and/ or alcohol.  *See also Nomes v. Astrue*, 155 Soc. Sec. Rep. Serv. 860, 2010 WL 3155507 at * 7 – 8 (W.D. Pa. 2010) (quoting *Warren v. Barnhart*, 2005 WL 1491012 at *10 (E.D. Pa. 2005)).

Side effects of drug and alcohol abuse, and any impact on other existing impairments, must be isolated so that the remaining limitations may be assessed.  Emergency Message 96200 ("EM-96200") at q. 25 – 28.  It is the ALJ's responsibility to assess the impact of the remaining limitations on a claimant's ability to work, and if it is not possible to distinguish between the limitations created by DAA or the claimant's other impairments, to find that DAA is not a contributing factor material to disability.  *Id*.  This "materiality finding must be based on medical evidence, and not simply on pure speculation about the effects that drug and alcohol abuse have on a claimant's ability to work."  *Ambrosini*, 727 F. Supp. 2d at 430 (citing *Sklenar v. Barnhart*, 195 F.Supp.2d 696, 699 – 706 (W.D. Pa. 2002)).

At present, Plaintiff argues a moot point:[7] it is clear that at Step 5 of the analysis, the burden shifts to the Commissioner to show that a significant number of jobs exist in the national economy for a claimant, despite established functional limitations.  In non-DAA cases, this burden is met by providing substantial evidence from the case record to support the conclusion

---

[7]      By way of further example, the court notes a non-exhaustive list of numerous other cases involving DAA in the Western District in which the burden placed upon the Commissioner at Step 5 of the sequential analysis has been delineated similarly to the present case.  *See Davis v. Astrue*, -- F. Supp. 2d __, 2011 WL 5563372 (W.D. Pa. Nov. 15, 2011); *Dawes v. Comm'r of Soc. Sec.*, 2011 WL 4704223 (W.D. Pa. Oct. 4, 2011); *Dunn v. Astrue*, 2011 WL 2580460 (W.D. Pa. Jun. 28, 2011); *Taliaferro v. Astrue*, 788 F. Supp. 2d 412 (W.D. Pa. 2011); *Carey v. Comm'r of Soc. Sec.*, 2011 WL 819284 (W.D. Pa. Mar. 2, 2011); *Nomes v. Astrue*, 2010 WL 3155507 (W.D. Pa. Aug. 3, 2010); *Ambrosini v. Astrue*, 727 F. Supp. 2d 414 (3d Cir. 2010); *Lancaster v. Astrue*, 2010 WL 1142036 (W.D. Pa. Mar. 24, 2010); *Debaise v. Astrue*, 2010 WL 597488 (W.D. Pa. Feb. 16, 2010); *Babilya v. Astrue*, 2009 WL 3183088 (W.D. Pa. Sep. 30, 2009); *Praias v. Astrue*, 2008 WL 4462293 (W.D. Pa. Sep. 29, 2008).  While the court certainly appreciates counsel's willingness to vigorously advocate on behalf of his client, the court would advise counsel that, in the future, concise reference be made to the aforementioned cases which have previously dealt with this issue so that the court's time may be utilized more effectively.

that a claimant can work. In cases where a claimant's use of drugs or alcohol may be the primary contributor of functional limitation, regulation provides that the ALJ's burden is to provide substantial evidence from the record to show that – absent DAA-related functional limitations – a claimant is eligible for a significant number of jobs in the national economy.

However, while an ALJ has the duty to develop a full and fair record, and provide substantial evidence to justify his final decision, it is important to emphasize that a claimant bears the ultimate burden of providing evidence as proof of disability. *Ventura v. Shalala*, 55 F. 3d 900, 902 (3d Cir. 1995); *Schwartz v. Halter*, 134 F. Supp. 2d 640, 656 (E.D. Pa. 2001) (citing *Hess v. Sec'y of Health, Ed. and Welfare*, 497 F. 2d 837, 840 (3d Cir. 1974)). Moreover, it does not appear that the holding in *Parra* is totally incompatible with the above standards. The court in *Parra* held that the claimant in that case bore the burden of proving that his DAA was not material inasmuch as it was consistent with the claimant's ultimate burden of proving entitlement to disability benefits. *Parra*, 481 F.3d at 748.

In the present case the ALJ acknowledged that it was his duty to disentwine those limitations related solely to Plaintiff's DAA, and those limitations stemming from Plaintiff's other impairments, to determine whether the DAA was material to Plaintiff's disability. (R. at 13 – 14). This statement is fully in line with Plaintiff's argument – that the ALJ must provide substantial evidence to show that DAA is material.

Additionally, even if the ALJ's reliance upon *Parra* was erroneous, the error was harmless. The ALJ's materiality analysis comported with what is required by the regulations. The ALJ provided substantial evidence from the record to bolster his materiality finding, and separated those limitations attributable to Plaintiff's DAA from those attributable to the remainder of Plaintiff's impairments. The Commissioner's burden was, therefore, properly met.

Plaintiff fails to illustrate how the substitution of particular language in the ALJ's decision in place of the ALJ's citation of *Parra* would have resulted in a different analysis or ultimate conclusion by the ALJ. *See Rutherford v. Barnhart*, 399 F. 3d 546, 553 (3d Cir. 2005) (error is harmless and does not justify remand where it would not affect the outcome of the case).

Plaintiff next argues that even assuming that the ALJ used the proper method of analyzing DAA, Plaintiff was entitled to disability benefits, because despite documented, sustained periods of sobriety, his psychological disturbance still presented significant functional limitations precluding work. (ECF Nos. 11 at 9 – 12; 14 at 3; 17 at 4 – 5). Alternatively, Plaintiff argues that the evidence was equivocal at best, and that in such a case, the ALJ cannot properly conclude that DAA is material. (*Id.*); EM-96200.

Here, however, the ALJ adequately supported his determination that DAA was material to Plaintiff's disability. As noted by the ALJ, there was minimal documentation of Plaintiff's mental health treatment in the record. (R. at 16 – 25). Significantly, a large portion of what was provided dealt with the ill-effects of Plaintiff's alcohol abuse. (R. at 16 – 25). In the various functional capacity assessments conducted, Plaintiff's primary problem tended to be his alcoholism. (R. at 16 – 25). His limitations were attributed primarily to his alcoholism. (R. at 16 – 25). Specifically, Dr. Newman found that Plaintiff would suffer no major dysfunction, aside from some depression and irritability, if he refrained from alcohol abuse. (R. at 16 – 25).

Plaintiff attempted detoxification on many occasions, but was substantially non-compliant with follow-up treatment throughout the course of the record. (R. at 16 – 25). At several places in the record, Plaintiff was indicated to have lost his past employment due to his drinking. (R. at 16 – 25). Periods wherein Plaintiff abstained from alcohol and maintained his

prescription medication regimen showed significant improvement in his mental state. (R. at 16 – 25).

The ALJ specifically relied upon the findings of Dr. Newman in determining what limitations were related to Plaintiff's alcohol use. (R. at 16 – 25). The ALJ corroborated Dr. Newman's findings with those of Dr. Wayne at Mon Yough, noting that – as Dr. Newman predicted – Dr. Wayne found Plaintiff to improve significantly when he adhered to his medication regimen, attended therapy, and abstained from alcohol use. (R. at 16 – 25). By the end of the record, Plaintiff reported experiencing no mental difficulties, and Dr. Wayne found Plaintiff's mental faculties to be completely within normal limits. (R. at 16 – 25). Dr. Palchick noted Plaintiff's psychological issues to be stable. (R. at 16 – 25). In light of the above, the ALJ's determination that DAA was material to Plaintiff's disability was supported by substantial evidence. (R. at 16 – 25).

## VI.    CONCLUSION

Based upon the foregoing, the decision of the ALJ is adequately supported by substantial evidence from Plaintiff's record. Reversal or remand of the ALJ's decision is not appropriate. Accordingly, Plaintiff's Motion for Summary Judgment is denied, Defendant's Motion for Summary Judgment is granted, and the decision of the ALJ is affirmed. Appropriate Orders follow.

_s/ Nora Barry Fischer_
Nora Barry Fischer
United States District Judge

Dated: January 24, 2012
cc/ecf: All counsel of record.